UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STERLING EQUIPMENT, INC.<br><br>*Plaintiff*<br><br>v.<br><br>WENDY GIBSON and<br>JOHN DOE NOS. 1-20<br><br>*Defendants.* | C.A. No. 1:16-cv-11594-RGS |

## STERLING EQUIPMENT, INC.'S
## STATEMENT OF UNDISPUTED FACTS

Plaintiff Sterling Equipment, Inc. ("SEI"), by its attorneys, Pierce Atwood, LLP, submits in support of its Motion for Summary Judgment the following Statement of Undisputed Facts:

## PARTIES

1. Sterling Equipment, Inc. ("SEI") is a Massachusetts Corporation with offices in Quincy, Massachusetts. Complaint, dated August 4, 2016, Docket No. 1, at ¶ 1 ("Complaint"); Defendant's Answer, Admissions and Denials, dated September 21, 2016, Docket No. 7 ("Answer") at ¶ 1.

2. Wendy Gibson ("Gibson") is a former employee of SEI. Complaint at ¶ 2; Answer at ¶ 2.

### *Gibson's Role and Responsibilities as SEI's Controller*

3. Gibson was hired by SEI on January 24, 2011 and was promoted to SEI's controller in July of 2011. Complaint at ¶ 6; Answer at ¶ 6. In 2013, Gibson moved from Massachusetts to Florida but SEI accommodated her move and permitted her to do her work as

{W6300252.1}

controller for SEI remotely from Florida. Transcript of Deposition of Robert D. Cresenzo ("Bobby D. Dep. Tr.") 19:7-24.[1]

4. Gibson remained SEI's controller until October of 2015. Transcript of Deposition of Wendy Gibson ("Gibson Dep. Tr.") at 25:11-15.[2]

5. As controller, Gibson was responsible for all accounting functions at SEI, including payroll, billing, accounts payable, producing financials and costs analysis. Gibson Dep. Tr. 25:3-10; Bobby D. Dep. Tr. 23:3-18; 24:1-21; 26:1-9; 32:22-33:18.

6. Gibson was also entrusted with access to and the management of and was a listed authorized representative for each of SEI's bank accounts, and was entrusted with the daily balancing and preparing weekly cash status reports to management. Gibson Dep. Tr. 29:1-29:18; Transcript of Deposition of Andrew Goldberg ("Goldberg Dep. Tr.") 9:21-10:17.[3]

7. In 2013, Gibson was also made the controller for the Demolition Company, an affiliate of SEI. Gibson Dep. Tr. 27:8-16; 30:11-13.

8. Gibson remains in possession of all emails, financial records, bank statements and account statements and the financial reports from the day she was hired by SEI until her termination, all stored on a portable hard drive copy of the hard drive of her SEI laptop in her possession that Gibson has refused to return to SEI. Gibson Dep. Tr. 30:19-22; 31:10-14; 33:17-21; 34:5-11; 35:24-36:24.

9. As to SEI's bank account with Santander Bank (the "Santander Account"), Gibson was able to "write checks out of the system," release wire transfers and make inter-

---

[1] The cited excerpts for the Bobby D. Dep. Tr. are appended to the Affidavit of Jeffrey E. Francis ("Francis Aff.") as **Exhibit B**. The Francis Aff. is appended hereto as **Exhibit 1.**
[2] The cited excerpts from the Gibson Dep. Tr. are appended to the Francis Aff. as **Exhibit A**.
[3] The cited excerpts from the Goldberg Dep. Tr. are appended to the Francis Aff. as **Exhibit C**.

company account transfers drawn on the Santander Account. Gibson Dep. Tr. 39:8-17; Goldberg Dep. Tr. 12:12-18; Bobby D. Dep. Tr. 18:4-7.

10. In a typical month, Gibson would be responsible for upwards of $7 million dollars in cash deposits and withdrawals for SEI involving the Santander Account. Gibson Dep. Tr. 39:18-40:4; 41:14-42:3.

11. Gibson was entrusted with a stamp with the signature of SEI's president, Robert DeCrescenzo ("Bobby D.") for the purpose of signing checks from SEI's bank accounts. Gibson Dep. Tr. 41:1-13; Bobby D. Dep. Tr. 16:14-17:5.

12. SEI management placed their trust in Gibson. Gibson Dep. Tr. 156:22-24; Bobby D. Dep. Tr. 49:19-50:12.

13. In 2013, Gibson threatened to leave SEI because she claimed she needed to move to Florida to help with her husband's family. In order to retain Gibson, SEI agreed to move Gibson's location of employment with SEI from Quincy, Massachusetts to Plantation, Florida. Gibson Dep. Tr. 40:8-21.

14. SEI had no operation or business in Florida and opened the Florida office solely as an accommodation to Gibson. Gibson Dep. Tr. 62:18-63:5; Bobby D. Dep. Tr. 19:7-24.

15. Gibson was permitted to make all arrangements for the opening of the Florida office and was empowered to hire and terminate her subordinate employees in the new Florida office. Bobby D. Dep. Tr. 19:7-24.

16. Gibson used this authority to terminate, under false pretenses, Deanna Trott, the only other SEI employee to observe Gibson's actions on the day of the Fraudulent Wire Transfer only two weeks after the Fraudulent Wire Transfer. Gibson Dep. Tr. 146:9-147:15.

17. Bobby D. and SEI's General Manager, Mark Quinn ("Quinn"), were located, at different times, in either New York or Massachusetts, but never in Florida. Gibson Dep. Tr. 48:12-19.

18. Once a week, Gibson would receive a report of outstanding SEI invoices. From that report Gibson would decide which invoices to pay and would issue checks for their payment. Gibson Dep. Tr. 48:20-49:8; Goldberg Dep. Tr. 14:14-24; 15:14-16:12.

19. Gibson described the process for issuing a wire transfer from SEI as follows: "I would call and get Bobby D.'s approval and then set it up in the Bank and send it." Gibson Dep. Tr. 49:20-23.

20. To release a wire transfer from the Santander Account, Gibson would access a password protected portal into the Santander Account in order to enter wire transfer instructions according to which instructions funds from the Santander Account in Massachusetts were released. Complaint at ¶ 9, Answer at ¶ 9, Affidavit of Santander Bank, N.A. ("Santander Aff.") at ¶¶ 4-7[4]; Gibson Dep. Tr. 49:24-51:8; Goldberg Dep. Tr. 16:20-18:20.

21. At the time of the Wire, Santander had various controls in place for completing wire transfers from SEI's Santander bank account. These controls were intended to prevent the fraudulent use of SEI's bank account. Santander Aff. at ¶ 3.

22. To access SEI's accounting using Santander's online banking platform required the entry of a username, Organization ID and password specific to the user connected to SEI's account. Santander Aff. at ¶ 4; Goldberg Dep. Tr. 16:20-18:20.

23. Once logged in to the system and SEI's account, creating and releasing a wire transfer would require these additional procedures be followed:

---

[4] The Santander Aff. is appended hereto as **Exhibit 2**.

a. Santander issued SEI a physical device called a token, which generates a random six (6) digit unique passcode.

b. All Santander-issued tokens contain a number pad where the user must enter a unique four (4) digit PIN before a passcode is provided.

c. Once the passcode is provided, it is valid for only 30 seconds and, once expired, need to be regenerated in order to log in to the Santander wire transfer site.

d. Each Santander token is assigned to a specific Santander account, so there is a one-to-one relationship between and account and a particular token. As such, SEI's Santander-issued token could only be used to create and release wire transfers from SEI's account, and wire transfers can only be created and released from SEI's account using the Santander token issued to SEI.

Santander Aff. at ¶ 5; Goldberg Dep. Tr. 16:20-18:20.

24. In summary, in order to access the functions necessary to release online bank wires from SEI's account, the Santander online banking website requires knowing (i) a valid username, Organization ID and password for the SEI account, (ii) having possession of the specific token related to the SEI account, (iii) knowing the PIN to that specific token, (iv) obtaining a 6 digit passcode and (v) entering that passcode within 30 seconds of its generation. If any of these conditions are not met, either access to SEI's account would not be granted or a wire would not be released from SEI's account. Santander Aff. at ¶ 6; Complaint at ¶¶ 9-10; Answer at ¶¶ 9-10; Goldberg Dep. Tr. 16:20-18:20.

25. Defendant Wendy Gibson had authorization to create and release wire transfers from the SEI account. She was assigned a PIN Fob or token specific to her Santander Bank online account login and password for SEI's account, which was registered solely for Ms.

Gibson's use and possession when accessing SEI's accounts. Santander Aff. at ¶ 7; Goldberg Dep. Tr. 16:20-19:23.

26. Gibson's PIN Fob would only generate the six digit passcode necessary to release a wire when Ms. Gibson's personal confidential four digit PIN code was manually entered into the token. Santander Aff. at ¶ 8; Goldberg Dep. Tr. 16:20-19:23; 49:8-21; 59:24-60:24.

### *The Fraudulent Wire Transfer*

27. On August 22, 2014, a wire transfer for one hundred and ninety eight thousand dollars ($198,000) was issued from SEI's bank account in Massachusetts purportedly to a Unique Holdings Corp. in payment of a purported Invoice No. 209 (the "Fraudulent Wire Transfer"). However, in truth, there was no Invoice No. 209 from a Unique Holdings Corp. and the entire transfer was a fraud committed to misappropriate SEI's funds. Complaint at ¶ 13; Answer at ¶ 13; Gibson Dep. Tr. 53:2-54:2, Exh. 11; Goldberg Dep. Tr. 80:9-11; Santander Aff. at ¶2, Exh. A.

28. Santander was unable to stop the Fraudulent Wire Transfer and SEI was unable to recover the Funds back. Goldberg Dep. Tr. 36:12-37:12.

29. Santander confirmed that the fraudulent wire "was created on the Santander online banking site, using Ms. Gibson's password protected account. The wire was then released using a six digit passcode generated by Ms. Gibson's token." Santander Aff. at ¶ 9 Gibson Dep. Tr. 54:6-22; Goldberg Dep. Tr. 49:8-21; 59:24-60:24.

30. Santander is unaware of any situation where a token was compromised remotely by a third party. Santander Aff. at ¶ 10.

31. Santander concluded that:

> The wire transfer was created using Ms. Gibson's token and six digit passcode. While Santander cannot definitively confirm that

> Ms. Gibson personally used her token and six digit passcode to release the wire, Santander has no evidence to suggest that anyone other than Ms. Gibson used her token and six digit passcode to create and release the wire.

Santander Aff. at ¶ 11.

32. Gibson admits that she was aware of the instruction for the fraudulent wire transfer had been entered into the Santander portal prior to the release of the Fraudulent Wire Transfer and, despite being in repeated communication with both Quinn and Bobby D., never inquired about or informed them of these instructions prior to the release of the Fraudulent Wire Transfer. Gibson Dep. Tr. 54:18-22; 86:13-87:8; 90:9-13; 107:9-14; Bobby D. Dep. Tr. 46:20-48:12.

33. Gibson does not dispute that the Fraudulent Wire Transfer was issued from Gibson's computer. Indeed, Gibson immediately conceded to Bobby D. that the Fraudulent Wire Transfer issued from her SEI laptop but claimed that her laptop had been "hacked". Gibson Dep. Tr. 91:14-16; Bobby D. Dep. Tr. 46:20-47:9.

34. In the limited financial records provided by Gibson, at least seventy thousand dollars of deposits were made into her bank accounts for which Ms. Gibson (who made only seventy-five thousand dollars a year while employed by SEI) could not explain the source of. Gibson Dep. Tr. 108:9-109:15; 114:16-116:20; 117:16-21; Affidavit of Kimberly Train, appended hereto as Exhibit 3, at ¶¶ 5 to 21.

35. After the Fraudulent Wire Transfer, Gibson admitted to a high level of conspicuous consumption including the acquisition on three separate occasions of automobiles each more than $50,000 in price. Gibson Dep. Tr. 120:22-124:11.

36. In the days immediately following the Fraudulent Wire Transfer, an outside information technology professional retained by SEI, Quen Pham, conducted a scan for computer viruses in Gibson's computer and found none. Gibson Dep. Tr. 135:7-136:5, Exh. 27.

37. Thereafter, Gibson's laptop was shipped from Florida to SEI where it remained untouched until it was delivered to David Sun ("Sun's") of SunBlock Systems for Sun's examination to determine whether Gibson's laptop showed any evidence of

> a virus, key-stroke logger or other malware that could have caused a laptop to send a fraudulent wire transfer and whether there is any evidence that a third-party interloper had access to Gibson's laptop in order to cause the laptop to send a fraudulent wire transfer.

See Expert Report of David Sun ("Sun E.R."), which is appended to the Francis Aff. as **Exhibit D**, at ¶¶ 1, 29-38; Complaint at ¶ 18; Answer at ¶ 18; Goldberg Dep. Tr. 51:23-53:7.

38. Before shipping the SEI laptop to SEI, Gibson made and has, to date, refused to turn over to SEI a copy of the hard drive to Gibson's SEI laptop. Gibson Dep. Tr. 30:19-31:14; 35:24-37:14; 53:10-23; 129:24-132:2.

39. Based on his examination of Gibson's laptop, Sun concluded that

   a. There is no evidence of a virus, key stroke logger or other malware present on Gibson's laptop.

   b. There is no evidence that a third-party interloper had access to Gibson's laptop or initiated the Fraudulent Wire Transfer.

   c. There is evidence on the Gibson laptop of the Fraudulent Wire prior to its release and the Wire could have been deleted prior to release.

Sun E.R. at ¶¶ 13, 36.

40. In addition Sun found evidence of the wire transfer instructions on Gibson's laptop, evidence that Gibson was using her laptop at the time of the Fraudulent Wire Transfer

and found evidence that an effort had been made to delete evidence of the wire transfer from "user controllable portions" of the laptop's hard drive. Sun E.R. at ¶ 31-35.

41. Gibson did not provide her PIN Fob to anyone other than herself. Gibson Dep. Tr. 144:18-145:10; 149:11-16.

42. Gibson's PIN Fob was in her desk in her office in Plantation, Florida on the day of the Fraudulent Wire Transfer and Gibson does not claim that someone else took possession of her PIN Fob. Gibson Dep. Tr. 144:18-145:10; 149:11-16.

43. Gibson did not provide her personal PIN that was required for entry into the PIN Fob to get the PIN Fob to generate a code to release a wire transfer to anyone. Gibson Dep. Tr. 144:18-145:10; 149:20-150:5.

44. Gibson conceded that as the Fraudulent Wire Transfer was released from her laptop, using her PIN fob that she has no explanation as to how the wire transfer was issued if it was not issued by her. Gibson Dep. Tr. 160:6-11.

Respectfully submitted,

**STERLING EQUIPMENT, INC.,**

By its counsel,

*/s/ Jeffrey E. Francis*
Jeffrey E. Francis (BBO #639944)
Pierce Atwood LLP
100 Summer Street, Suite #2250
Boston, Massachusetts 02110
jfrancis@pierceatwood.com
(T) 617-488-8136

Dated: August 31, 2017

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 31, 2017, I electronically filed the above document by using the CM/ECF system which will send notification of such filing(s) to all registered participants.

                                                           */s/ Jeffrey E. Francis*
                                                           Jeffrey E. Francis