# EXHIBIT A

**In The Matter Of:**

*Sterling Equipment, Inc. v.*
*Wendy Gibson, et al.*

---

*Wendy Gibson*
*June 02, 2017*

---

*195 State Street • Boston, MA 02109*
*888.825.3376 - 617.399.0130*
*Global Solutions*
*court-reporting.com*



Original File Wendy Gibson 6-2-17.txt
Min-U-Script® with Word Index

```
1              UNITED STATES DISTRICT COURT
2               DISTRICT OF MASSACHUSETTS
3                         C.A. No. 1:16-cv-11594-RGS
4
5    STERLING EQUIPMENT, INC.,
6                   Plaintiff,
7         vs.
8    WENDY GIBSON and
9    JOHN DOES NOS. 1-20,
10                  Defendant.
11
12
13
14              DEPOSITION OF WENDY GIBSON, a witness
15   called on behalf of the Plaintiff, taken pursuant to
16   the applicable provisions of the Federal Rules of
17   Civil Procedure before Cynthia A. Powers, Shorthand
18   Reporter and Notary Public in and for the
19   Commonwealth of Massachusetts, at the law offices of
20   Pierce Atwood, LLP, 100 Summer Street, Boston,
21   Massachusetts, on Friday, June 2, 2017, commencing
22   at 9:56 a.m.
23
24
```

APPEARANCES:

       Jeffrey E. Francis, Esquire

       Pierce Atwood, LLP

       100 Summer Street

       Boston, Massachusetts 02110

       (617) 488-8170

       Representing the Plaintiff

       Lauren M. Thomas, Esquire

       Lauren Thomas Law

       220 Commercial Street, Suite 9

       Boston, Massachusetts 02109

       (617) 997-7957

       Representing the Defendant

1          P R O C E E D I N G S

2                WENDY GIBSON,

3

4        having been satisfactorily identified

5        and duly sworn by the Notary Public,

6        was examined and testified as follows:

7

8                DIRECT EXAMINATION

9    BY MR. FRANCIS:

10        Q.    State your full name for the record.

11        A.    Wendy Gibson.

12        Q.    What is your present address?

13        A.    12337 Homeport Drive, Maurepas,

14    Louisiana.

15        Q.    Have you been deposed before?

16        A.    No.

17        Q.    I'm going to give you some instructions.

18    We're going to proceed by questions and answer; my

19    questions, your answers.  It's for everyone's

20    benefit if you leave a little break between my

21    question and your answer; it helps the court

22    reporter, and it gives your counsel an opportunity

23    to object.  Most of the time your counsel's

24    objections will be for the record, and you should

```
 1   Equipment; is that correct?
 2        A.    Yes.
 3        Q.    How did your responsibilities change?
 4        A.    Now I became responsible for all
 5   accounting functions.
 6        Q.    What do you mean by responsible for all
 7   accounting functions?  What are all accounting
 8   functions?
 9        A.    Payroll, billing, accounts payable,
10   producing financials, cost analysis.
11        Q.    How long did you hold your position as
12   controller of Sterling Equipment?
13        A.    Until October '15.
14        Q.    October of 2015?
15        A.    Yes.
16        Q.    What was your annual salary as
17   controller of Sterling Equipment?
18        A.    Seventy-five.
19        Q.    Is that $75,000?
20        A.    Yes.
21        Q.    Was that true through each of the years
22   that you were employed by Sterling Equipment?
23        A.    I think in the beginning I started at
24   fifty-eight or something.
```

1   dollars?

2       A.    I would think so.

3       Q.    In 2014 did you receive any other

4   compensation from any other source?

5       A.    Not that I recall.

6       Q.    You need to speak --

7       A.    I'm sorry, not that I recall.

8       Q.    Now, did you also do accounting work for

9   an entity called The Demolition Company?

10      A.    Yes.

11      Q.    When did you start doing accounting work

12  for them?

13      A.    Probably around 2013, maybe.

14      Q.    Okay.  Were you the controller for The

15  Demolition Company?

16      A.    Yes.

17                (Marked Exhibit 2, Sterling

18                Equipment Tasks)

19      Q.    GIBSON 998 is Exhibit 2.  First, can you

20  tell me, do you recognize that document?

21      A.    Yes.

22      Q.    What is it?

23      A.    It's the list of tasks that I would do

24  at the end of every month.

1       Q.     Were you also responsible for managing

2    Sterling Equipment's bank accounts?

3       A.     Yes.

4       Q.     What would that require you to do?

5       A.     I did a daily balancing each day, and we

6    did a weekly cash status report that went to

7    management.

8       Q.     Did you have access to Sterling

9    Equipment's bank accounts?

10       A.     Yes.

11       Q.     What was the scope of that access?

12       A.     I was able to write checks, although I

13    couldn't sign them.  I could do the activity.  I

14    could send wires.

15       Q.     If you were to call the bank, would they

16    have had you listed as an authorized representative

17    such that they could respond to your inquiries?

18       A.     Yes.

19       Q.     What other authority did you have for

20    dealing with the bank accounts?

21       A.     That was it.

22              MR. FRANCIS:  Let's mark a couple

23              of documents here.

24

1          (Marked **Exhibit 3,** Advice of

2     Credit/Incoming Wire)

3          MR. FRANCIS:  For the record,

4     Exhibit 3 is Bates stamped GIBSON 1657

5     through 1659.

6     Q.   First, could you tell me what this

7  document is?

8     A.   It's advice of an incoming wire.

9     Q.   This is for The Demolition Corporation?

10    A.   Yes.

11    Q.   When did you become the controller for

12 The Demolition Corporation?

13    A.   I think it was '13.

14    Q.   2013, and this is dated March 6th, 2013?

15    A.   Mm-hmm.

16    Q.   Were you the controller of The

17 Demolition Corporation at that time?

18    A.   I don't recall the exact date.

19    Q.   You produced this in this litigation.

20 Why did you have that in your possession in 2017?

21    A.   Because I kept every e-mail that I ever

22 had.  I never deleted anything.

23    Q.   And did you search those e-mails for

24 documents relevant to this litigation to provide to

1    your counsel to produce?

2          A.    Yes.

3          Q.    Do you recall how many e-mails were

4    provided to your counsel to produce?

5          A.    I don't.

6                MS. THOMAS:   Objection.

7          Q.    When you were -- I'm sorry, you kept

8    e-mails for what period of time?

9          A.    From the day I started.

10         Q.    So you have your Sterling Equipment

11   e-mails from 2011 until your departure in 2015?

12         A.    Yes.

13         Q.    What are those e-mails stored on?

14         A.    External hard drive.

15         Q.    Do you also have financial documents

16   from Sterling Equipment from 2011 to 2015?

17         A.    I might have spreadsheets.

18         Q.    Do you also have bank statements for

19   Sterling Equipment for that period of time?

20         A.    I don't think so.

21                (Marked Exhibit 4, Bank

22                Statements)

23                (Marked Exhibit 5, Bank

24                Statements)

1          Q.     Exhibit 6 is Bates stamped GIBSON 1862

2     to 1871.  Could you tell me if you can identify what

3     that document is?

4          A.     It's a bank reconciliations report from

5     the system.

6          Q.     From what system?

7          A.     From Sterling's accounting system.

8          Q.     Do you know why you had this in your

9     possession and control to have produced by your

10    counsel in this liquor?

11         A.     Other than I have it saved in my

12    documents.

13         Q.     Okay.  Now, no e-mails were produced in

14    connection with Exhibits 4, 5 and 6.  Are you aware

15    of any e-mails associated with these documents?

16         A.     No.

17         Q.     For what period of time are you in

18    possession of Sterling Equipment's financial

19    records?

20         A.     I have everything from the day I

21    started.

22         Q.     And you have all that financial

23    information on that hard drive?

24         A.     I don't think I have financials.  I may

1   have spreadsheets or things like that if I had to

2   save them to e-mail them to someone, anything I

3   would have needed in the regular course of the

4   business.

5           Q.    So you have account statement

6   reconciliation reports; correct?

7           A.    Yes.

8           Q.    You have Sterling Equipment bank

9   statements?

10          A.    Yes.

11          Q.    Okay.

12                      (Marked Exhibit 7, GL Trial

13                      Balance)

14          Q.    The Exhibit 7 is GIBSON 1455.  Can you

15   tell me what Exhibit 7 is?

16          A.    A trial balance.

17          Q.    What is a trial balance?

18          A.    It shows the balance in the account on

19   any -- on a particular date.

20          Q.    This is for Sovereign Bank, N.M., for

21   Sterling Equipment dated May 12, 2013.  Do you know

22   why you were in possession of this document?

23          A.    I don't.  I mean, it's a report that we

24   always, you know, we run in the regular course of

1    business.

2       Q.  So how many different bank accounts were

3    you managing for Sterling Equipment in 2014?

4       A.  I think Sterling only had two.

5       Q.  So we've seen at least one Santander

6    account; correct?

7       A.  I think they had two Santander accounts.

8           (Marked Exhibit 8, Capital One

9           Account Summary)

10      Q.  Exhibit 8 is marked as GIBSON 1493.

11   Could you tell me what Exhibit 8 is?

12      A.  Capital One bank statement.

13      Q.  Do you know why you had this in your

14   possession?

15      A.  I don't know what this is.  I don't

16   recognize the company.

17      Q.  Was this pulled off of your Sterling

18   Equipment hard drive?

19      A.  I don't know.

20      Q.  Well, it was produced by your counsel in

21   this matter in response to document requests.  Do

22   you recall providing this to your counsel?

23      A.  Yeah.

24      Q.  Where is this external hard drive with

1       Q.    Did Sterling Equipment also provide you

2  with a cell phone?

3       A.    Yes.

4       Q.    Do you still own that cell phone?

5       A.    No.

6       Q.    Do you still own a cell phone which

7  Sterling Equipment had provided you?

8       A.    Yes.

9       Q.    When did Sterling Equipment provide you

10 with that cell phone?

11      A.    I don't know.

12      Q.    And you still have that cell phone in

13 your possession?

14      A.    Yes.

15      Q.    Is that the cell phone you were using in

16 2014 for Sterling Equipment?

17      A.    I don't know.

18            MR. FRANCIS:  *I call for the

19            production of the Sterling Equipment

20            cell phone.  Mark an asterisk next to

21            that on the record.

22            MS. THOMAS:  Objection.

23            MR. FRANCIS:  Mark this as the

24            next exhibit.

1      A.    No.  They had several.  I'm glad you

2  showed me this.  They had several investment

3  accounts with different banks.  I had no access to

4  those banks.  The only thing I did was receive the

5  statements and reconcile it.

6      Q.    What did you reconcile it against?

7      A.    The accounting system.

8      Q.    So you had greater access to the two

9  Santander accounts than you did to the Flagstar

10 account?

11     A.    Yes.

12     Q.    Could you describe the access and

13 control you had over the Santander account?

14     A.    Like I said, I was able to write checks

15 out of the system which would be drawn on those

16 accounts; I was able to transfer money between

17 Sterling accounts; and I was able to wire money.

18     Q.    Exhibit 4, the Santander account dated

19 June 11, 2013, shows a beginning balance of

20 $1,169,883 and an ending balance of $1,720,000 and

21 deposits and credits of approximately $7 million

22 with withdrawals of approximately $7.3 million.  Do

23 you see that?

24     A.    Mm-hmm.

1      Q.    So would that be typical for you in a

2   typical month?  Would you be handling upwards of

3   $7 million of cash deposits and withdrawals?

4      A.    Yes.

5      Q.    You'll see there are a number of checks

6   attached to Exhibit 4.  Do you see those?

7      A.    Yes.

8      Q.    Okay.  So during the time that you were

9   in Plantation, Florida, working for Sterling

10  Equipment, do you recall -- first, when did you move

11  down to Plantation, Florida?

12     A.    2012.

13     Q.    Okay.  You were there working for

14  Sterling Equipment until what year?

15     A.    '14.

16     Q.    And during that period of time -- I'm

17  sorry, this bank statement from June 1 of 2013 to

18  June 30, 2013 was during the time that you were

19  Sterling Equipment's controller but working in

20  Plantation, Florida; correct?

21     A.    Yes.

22     Q.    These checks that you were issuing off

23  of this Santander account, who signed the checks?

24     A.    Bobby D.

1      Q.      Was Bobby D located in Plantation,

2  Florida?

3      A.      No.

4      Q.      How did you logistically get Bobby D to

5  sign the checks?

6      A.      Some of them we would send directly to

7  him whether he was in Quincy or the New York office,

8  and he would sign them.  Other times we would scan

9  copies to him, and he would give permission to stamp

10 his name.

11     Q.      So you possessed a stamp with Bobby D's

12 name on it for signing checks?

13     A.      Yes.

14     Q.      So during your time with Sterling

15 Equipment, as their controller you were managing

16 millions of dollars in funds each month; correct?

17     A.      Yes.

18     Q.      You had access to Sterling Equipment's

19 bank accounts; correct?

20     A.      Yes.

21     Q.      You had the authority to issue wire

22 transfers from these accounts; correct?

23     A.      Yes.

24     Q.      You had a stamp which permitted you to

1   sign Bobby D's name making checks off these checking

2   accounts; correct?

3        A.   Yes.

4        Q.   So Santander was putting a lot of trust

5   in you at that time in 2013 and 2014; correct?

6             MS. THOMAS:  Objection.

7        A.   Yes.

8        Q.   Were you -- let's talk about that office

9   in Plantation.  Why did you move from Quincy to

10  Plantation, Florida?

11       A.   My husband's ex-wife passed away, and we

12  moved to take care of his kids.

13       Q.   When did that move occur?

14       A.   2012.

15       Q.   Did Sterling immediately open an office

16  in Plantation, Florida, when you moved down?

17       A.   No.

18       Q.   Where did you perform your tasks for

19  Sterling when you first moved to Plantation?

20       A.   At home.

21       Q.   Did they provide you with any office

22  equipment?

23       A.   My computer.

24       Q.   Anything else?

1        Q.    So if an invoice came into the office

2   requesting payment from Sterling Equipment, what

3   would you do with that invoice?

4        A.    Stamp it and hand it to Natasha.

5        Q.    What would she do?

6        A.    She would get approval from Mark or

7   Bobby, enter it in the system, and that was it.

8        Q.    Bobby is Bobby D?

9        A.    Yes.

10       Q.    Who was Mark?

11       A.    Mark Quinn.

12       Q.    What was Mark Quinn's position with

13  Sterling?

14       A.    General manager.

15       Q.    What was Bobby D's?

16       A.    President.

17       Q.    They were both located in either New

18  York or Massachusetts?

19       A.    Yes.

20       Q.    And after the invoice was entered into

21  the system, how would that invoice go about getting

22  paid?

23       A.    The system would assign a due date, and

24  the invoice would stay in the file until the due

1    date came up, and we paid whatever invoices were due

2    once a week.

3         Q.    Would you get a report from the system

4    of invoices that were due?

5         A.    Yes.

6         Q.    What would you do with that report?

7         A.    Select what we wanted paid and cut

8    checks.

9         Q.    How often were those invoices paid with

10   wire transfer rather than checks?

11        A.    Rarely.

12        Q.    Do you recall how many wire transfers

13   would go out of the Sterling office each month?

14        A.    I would say between ten and twenty.

15        Q.    And how many wire transfers would

16   typically go each week?

17        A.    I'm sorry?

18        Q.    How many each week, wire transfers?

19        A.    Like, five maybe.

20        Q.    What was the procedure for issuing the

21   wire transfer out of Sterling Equipment's office?

22        A.    I would call and get Bobby D's approval

23   and then set it up in the bank and send it.

24        Q.    What actions would it require for you to

1  set up a wire transfer with the bank and release it?

2      A.    You just had to go in and put the

3  vendor's banking information and the amount and what

4  date you wanted it to go.  That was it.

5      Q.    Okay.  When you say "go in," were you

6  going into the bank's Web site?

7      A.    Yes.

8      Q.    Did you have a log-in and password to do

9  that?

10      A.    Yes.

11      Q.    Did you have to put in any other

12  password to release a wire transfer?

13      A.    To do a release you had to key a code

14  from a fob.

15      Q.    What did this fob look like?

16      A.    Like a tiny calculator.

17      Q.    How did you get the fob to generate a

18  code to release a wire?

19      A.    I think it did it automatically.

20      Q.    Did you have to put a PIN into the fob

21  to get it to release a code?

22      A.    I don't remember.

23      Q.    Did you keep this fob on your person?

24      A.    It was in my desk drawer.

1        Q.      And the code that was generated by the

2    fob, how long was it good for?

3        A.      Probably a minute or so.

4        Q.      Okay.  What would you do with that fob

5    to get it to release a code?

6        A.      You just had to look at the screen, and

7    it would give you a code, and you put that code in

8    the computer.

9        Q.      It was always presenting a PIN?

10       A.      I don't recall what type of fob it was.

11   I don't.

12       Q.      Do you recall having to put anything

13   into that key fob to get it to release a PIN?

14       A.      I don't remember.

15       Q.      Do you know what happened to the fob you

16   were using in August of 2014?

17       A.      It would have been given to Andrew.

18       Q.      Once a wire was released, what type of

19   confirmation would you receive?

20       A.      An e-mail.

21       Q.      To whom would that e-mail go?

22       A.      Myself.

23       Q.      And typically how soon after releasing a

24   wire would you receive an e-mail?

1          A.    I don't recall what I found.

2                     (Marked Exhibit 11, Wire Advice)

3          Q.    Can you review what's been marked

4    Exhibit 11?  Could you tell me if you've seen that

5    before?

6          A.    Yes.

7          Q.    What is it?

8          A.    It's the confirmation of fraudulent

9    wire.

10         Q.    For the record, it is a wire transfer

11   debit for $198,000 to -- beneficiary is listed as

12   JSC Norvik Banka of Latvia.  Originator is Sterling

13   Equipment.  Attention Wendy Gibson.  Originator bank

14   is Santander.  The sender reference is to Unique

15   Holdings Corporation Invoice 209.

16               So, first, is this the confirmation that

17   you received of $198,000 wire transfer going out on

18   August 22, 2014, from the Santander -- Sterling

19   Santander account?

20         A.    Yes.

21         Q.    Do you recall receiving this specific

22   confirmation?

23         A.    Yes.

24         Q.    And this was a document pulled off of

 1    your Sterling Equipment hard drive; correct?

 2         A.    Yes.

 3         Q.    Was there any other e-mail associated

 4    with this document that you can recall?

 5         A.    Not that I recall.

 6         Q.    Okay.  You'll see that it says

 7    distributed at 14:38:49 EDT, or 2:38, roughly

 8    2:38 p.m. on August 22, 2014.  Do you see that?

 9         A.    Yes.

10         Q.    And the wire is listed as of August 22,

11    2014, at 2:36:47 seconds.  Do you see that?

12         A.    Yes.

13         Q.    Was seeing this wire transfer

14    confirmation, was this the first time that you saw

15    reference to a potential wire transfer of $198,000

16    to Unique Holdings?

17         A.    No.

18         Q.    When was the first time you saw a wire

19    transfer to Unique Holdings?

20         A.    When I logged into the bank earlier that

21    day to do a wire for one of our vendors, this wire

22    was already set up.

23         Q.    And do you recall what time during the

24    day that that happened?

1        A.    I was told they were both on vacation.

2        Q.    Okay.  After you failed to get in touch

3   with Diane Williams and Chris Anderson, what did you

4   do?

5        A.    I wasn't concerned because if they

6   didn't release it, I didn't think it would go

7   anywhere.

8        Q.    After failing to speak with Chris

9   Anderson and Diane Williams, you didn't do anything

10  further?

11       A.    No.

12       Q.    Do you recall what phone you used to try

13  to call Chris Anderson and Diane Williams?

14       A.    I don't.

15       Q.    Did you keep a diary of your actions in

16  August of 2014?

17       A.    No.

18       Q.    Did you ask Deanna Trott or discuss the

19  potential wire transfer with Deanna Trott prior to

20  it being sent?

21       A.    No.

22       Q.    The Unique Holdings Corporation, had you

23  ever heard of that company before?

24       A.    No.

1          Q.     Do you think the date was simply updated
2    when it was last accessed on February 14, 2017?
3          A.     It's possible.
4          Q.     Do you recall when you would have sent
5    this memorandum originally?
6          A.     I don't.
7          Q.     Did you send other memorandums to
8    employees?
9          A.     Yes.
10         Q.     What type of memos did you send to
11   employees of Sterling Equipment?
12         A.     Something like that when Bobby would
13   request me to write something up to send to all
14   employees.
15         Q.     How many employees did Sterling
16   Equipment have?
17         A.     Less than fifty.
18         Q.     What was the Sterling Equipment's
19   business?
20         A.     Rental of marine equipment.
21         Q.     When you were in Plantation, Florida,
22   did Sterling Equipment have a lot of business in
23   Florida?
24         A.     No.

1          Q.      Did it do any business in Florida?

2          A.      No.

3          Q.      What type of marine equipment would it

4     rent out?

5          A.      Barges, tugboats, cranes.

6          Q.      And this memorandum reads:

7                         "Cell phones issued by Sterling

8                         Equipment are intended for company

9                         use only.  In order to keep our

10                        costs down, cell phones should

11                        only be used when you do not have

12                        access to a land line.  If you are

13                        in the office, you should be using

14                        a land line instead of your cell

15                        phone.  Text messaging should also

16                        be limited to company related

17                        business.  Also, time spent on

18                        browsers such as Safari should be

19                        done for company business only.

20                        Please call Wendy at 617-984-0022

21                        if you have any questions or

22                        concerns."

23                 Do you see that?

24         A.      Yes.