UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| STERLING EQUIPMENT, INC. | ) | Case No: 1:16-CV-11594 RGS |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WENDY GIBSON and | ) | |
| JOHN DOE Nos. 1-20 | ) | |
| Defendants | ) | |
| | ) | |

**DEFENDANT WENDY GIBSON'S RESPONSE TO
STERLING EQUIPMENT, INC.'S STATEMENT OF UNDISPUTED FACTS**

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, the Defendant submits that the following

material facts are in dispute; therefore the Plaintiff is not entitled to Summary Judgment as a

matter of law:

1.      No question of material fact is raised by this paragraph.

2.      No question of material fact is raised by this paragraph.

3.      No objection.  Additionally, while the move to Florida was Wendy Gibson's

(hereinafter "Gibson") choice for family reasons it was Robert DeCrescenzo's (hereinafter

"Bobby D.") request that she continue to work for Sterling Equipment Inc. (hereinafter "SEI")

remotely.  (Bobby D[1], 19*/15-19[2]) (Gibson[3] 42*/8-12) (Answer ¶ 7)

4.      No objection.

---

[1] "Bobby D" refers to the transcript of Robert DeCrescenzo's deposition.
[2] Citations to all deposition transcripts shall be cited as 'page/line'.  To avoid duplication, an asterisk (*) will appear next to page sections that have already been attached as Exhibits to Plaintiff's Exhibit 1.  Additional sections are attached to Defendant's Exhibit 1.
[3] "Gibson" refers to the transcript of Wendy Gibson's deposition.

5.      No objection.

6.      No objection.  Additionally, Bobby D., Adeel Pyatt, Chris Anderson and Andy Goldberg were authorized to sign checks from the Santander account. (Bobby D. 16*/20, 17*/13-11)

7.      No objection.

8.      Objection.  It is true that Gibson believes that she has stored all of this information on a portable hard drive.  Gibson had been instructed to do this by Adil Dhouhi. (Gibson 130*/1-16)  All discoverable materials have been provided to SEI through counsel. Disclosure of the physical hard drive was objected to by counsel as it contains personal, non discoverable information as well. (Gibson 36/5-22)

9.      No objection. Additionally, Bobby D., Adeel Pyatt, Chris Anderson and Andy Goldberg were authorized to sign checks from the Santander account. (Bobby D. 16*/20, 17*/13-11) (Goldberg[4] 12/1-18)  Chris Anderson and Diane Williams were also authorized to complete wire transfers online. (Goldberg 17/1-20/17)  Jay Cashman and Dale Pyatt were also authorized to complete wire transfers by telephoning Santander Bank. (Goldberg 13/3-20)

10.     No objection.

11.     No objection.

12.     No objection.

13.     Objection as to characterization.  Gibson informed Bobby D. that she would be leaving her employment with SEI to move to Florida due to family matters.  Bobby D. initiated a discussion regarding how she could remain employed with SEI while living in Florida. (Bobby D, 19*/15-19) (Gibson 42*/8-12)

---

[4] "Goldberg" refers to the transcript of Andrew Goldberg's deposition.

14.     No objection.

15.     No objection.  Additionally, Gibson made firing decisions regarding employees at other Sterling locations. (Goldberg 72/16-74/21)

16.     Objection.  Gibson actions in the office on August 22, 2014 were observed by Natasha Maragh and Deanna Trott (hereinafter "Trott"). (Gibson 77/6-21)  Trott was later terminated for cause after discussions with Marty McCabe in the Human Resources Department at Sterling.  (Gibson 79/23-82/7, 83/8-19) (Trott[5] 45/22-46/13)  Additionally, there is nothing unusual about Gibson's authority to hire and fire employees and commonly made staffing decisions.  She had authority over staffing and made firing decisions regarding employees at other Sterling locations. (Goldberg 72/16-74/21)

17.     No question of material fact is raised by this paragraph.

18.     Objection. Once a week Gibson would prepare a report with a list of all the invoices that needed to be paid.  This report would be sent to Bobby D. for approval. (Bobby D. 23/16-25/8, 33*/11-15) (Goldberg 14*/14-16/14)

19.     No objection.  The process for completing wire transfers was described in much more detail by Goldberg (Goldberg 16*/20-18/12) and within the Affidavit of Santander Bank, N.A. (Plaintiff's Motion for Partial Summary Judgement, Exhibit 2)

20.     No objection.  This is the same process that would have been utilized by Chris Anderson and Diane Williams. (Goldberg 17/1-20/17) Additionally, Deanna Trott was aware of this procedure (Trott 18/1-16, 43/12-18)

---

[5] "Trott" refers to the transcript of Deanna Trott's Deposition.

21.     No objection.  Santander did not have controls such as eye scan, fingerprint or voice recognition to ensure that the person entering the password into the token was actually the person authorized to do so.

22.     No objection.

23.     No objection.  After a wire transaction was completed an email notification would be sent confirming the transaction. (Trott 25, 42-43)  Santander did not have controls such as eye scan, fingerprint or voice recognition to ensure that the person entering the password into the token was actually the person authorized to do so.

24.     No objection.  After a wire transaction was completed an email notification would be sent confirming the transaction. (Trott 25, 42-43)  Santander did not have controls such as eye scan, fingerprint or voice recognition to ensure that the person entering the password into the token was actually the person authorized to do so.

25.     No objection.  However, Trott was also aware of the procedure, knew where Gibson kept her token, had access to the token and access to Gibson's computer.  (Trott 18/1-19/10, 33/3-7, 43/12-18) (Gibson 50*/23-24, 143/9-15)  Additionally, there were other Sterling employees with authorization to complete wire transfers. (Goldberg 18/13-20/17)

26.     No objection.  However, Trott was also aware of the procedure, knew where Gibson kept her token, had access to the token and access to Gibson's computer.  (Trott 18/1-19/10, 33/3-7, 43/12-18) (Gibson 50*/23-24, 143/9-15)  Additionally, there were other Sterling employees with authorization to complete wire transfers. (Goldberg 18/13-20/17)

27.     No objection.

28.     No objection.  An email notification was received showing that the fraudulent wire transfer had gone through.  As soon as this notification was received, Gibson began trying

to contact Chris Anderson and Diane Williams to confirm which of them had authorized the wire

transfer.  When she was unable to reach either of them, Gibson reached out to Andrew Goldberg

(hereinafter "Goldberg").  Goldberg instructed Gibson to call Santander to try to stop the wire.

For much of the rest of the afternoon, Gibson, Goldberg and Trott were simultaneously

contacting Santander and attempting to reach other persons at SEI and Jay Cashman's company.

At one point Goldberg and Gibson were on a conference call with Santander trying to investigate

the details of the wire. (Trott 21/2-23/7, 47/17-48/10) (Gibson 90*/6-8, 93*/3-22, 98/1-107/8)

(Goldberg 30/23-33/15)

SEI was able to receive reimbursement for $98,000 from insurance. (Goldberg 47/19-

48/2)

29.     No objection.  However, Santander can not confirm that Gibson was the one who

was using the laptop and token at the time that the fraudulent wire transfer was completed.  Trott

was also aware of the procedure, knew where Gibson kept her token, had access to the token, and

access to Gibson's computer.  (Trott 18/1-19/10, 33/3-7, 43/12-18) (Gibson 50*/23-24, 143/9-

15) Gibson was out of the office frequently for cigarette breaks and other errands.  (Trott 28/6-

18) (Gibson 82/16-21, 88/3-6)

30.     No objection.

31.     No objection.  However, there is no evidence that Santander had a copy of Ms.

Trott's deposition when coming to this conclusion.  If it had that transcript, then Santander

would have been aware that Trott was also aware of the procedure, knew where Gibson kept her

token, had access to the token and access to Gibson's computer.  (Trott 18/1-19/10, 33/3-7,

43/12-18) (Gibson 50*/23-24, 143/9-15) Additionally that Gibson was out of the office

frequently for cigarette breaks and other errands.  (Trott 28/6-18) (Gibson 82/16-21, 88/3-6)

32.     No objection.  Additionally, when Gibson first saw the wire transfer in the portal, there was nothing to indicate that it was fraudulent.  Gibson was aware that at times Chris Anderson and Diane Williams would accidentally access Sterling's accounts.  Therefore, they would be the appropriate people with whom to discuss this wire transfer.  Neither Quinn or Bobby D. had the ability to log into Sterling's bank accounts. (Trott 27/10-17) (Goldberg 20/18-23) (Gibson 54/18-56/7, 89/4-13, 91/7-13, 93*/3-6, 97/8-18) (Bobby D. 44/8-14)

33.     No objection.  Trott was also aware of the procedure, knew where Gibson kept her token, had access to the token and access to Gibson's computer.  (Trott 18/1-19/10, 33/3-7, 43/12-18) (Gibson 50*/23-24, 143/9-15) Gibson was out of the office frequently for cigarette breaks and other errands.  (Trott 28/6-18) (Gibson 82/16-21, 88/3-6)

34.     Objection. On June 12, 2014 Gibson and her husband Peter executed divorce papers.  As part of their divorce proceedings the marital home was being sold.  Prior to January 1, 2015 Gibson had vacated the marital home and moved into an apartment.  The marital home was eventually sold.  Gibson and Peter reconciled and remarried in July 2015.  The proceeds from the sale of the previous marital home in Florida were used to purchase their current home in Louisiana.

Gibson and her husband Peter maintain both separate and joint bank accounts.  It is their habit that when Peter obtains his vacation pay he cashes the check and deposits it into the bank account as cash at an ATM.  Over the years the two have also taken advances on their credit cards.

In or around late 2015 Gibson used a credit card to put a down payment on a Cadillac.  In January 2016 she traded this car in.  The proceeds from that trade in were used to pay off the car loan she had obtained in 2015.  In and around this same time Peter Gibson obtained a loan which

was used to purchase a 2014 GMC Sierra, which is primarily used by Gibson.  In either December 2016 or January 2017 Peter acquired a Ford 350.  No cash was put down for either the GMC Sierra or the Ford 350.  Both were fully financed with loans.

Gibson denies that any of the transactions listed in Plaintiff's Exhibit 3 are from illegal gains.  (Affidavit of Wendy Gibson, Exhibit 2)

35.     Objection. On June 12, 2014 Gibson and her husband Peter executed divorce papers.  As part of their divorce proceedings the marital home was being sold.  Prior to January 1, 2015 Gibson had vacated the marital home and moved into an apartment.  The marital home was eventually sold.  Gibson and Peter reconciled and remarried in July 2015.  The proceeds from the sale of the previous marital home in Florida were used to purchase their current home in Louisiana.

Gibson and her husband Peter maintain both separate and joint bank accounts.  It is their habit that when Peter obtains his vacation pay he cashes the check and deposits it into the bank account as cash at an ATM.  Over the years the two have also taken advances on their credit cards.

In or around late 2015 Gibson used a credit card to put a down payment on a Cadillac.  In January 2016 she traded this car in.  The proceeds from that trade in were used to pay off the car loan she had obtained in 2015.  In and around this same time Peter Gibson obtained a loan which was used to purchase a 2014 GMC Sierra, which is primarily used by Gibson.  In either December 2016 or January 2017 Peter acquired a Ford 350.  No cash was put down for either the GMC Sierra or the Ford 350.  Both were fully financed with loans.

Gibson denies that any of the transactions listed in Plaintiff's Exhibit D are from illegal gains.  (Affidavit of Wendy Gibson, Exhibit 2)

36.     No objection.

37.     No objection.  However, Trott was the last person to have possession of the laptop prior to it being shipped from Florida to Sterling.  (Trott 33/22-34/15)

38.     Objection.  Gibson copied the contents of the laptop to a hard drive at the request of Adil Dhouhi (Gibson 130*/1-16) All discoverable materials have been provided to SEI through counsel.  Disclosure of the physical hard drive was objected to by counsel as it contains personal, non discoverable information as well. (Gibson 36/5-22)  Additionally, Trott was the last person to have possession of the laptop prior to it being shipped from Florida to Sterling. (Trott 33/22-34/15)

39.     No objection.  However, this investigation would not have been able to provide evidence of who was using the laptop.  Nor would it have revealed who actually deleted the material.  Trott was also aware of the procedure, knew where Gibson kept her token, had access to the token and access to Gibson's computer.  (Trott 18/1-19/10, 33/3-7, 43/12-18) (Gibson 50*/23-24, 143/9-15) Additionally, Trott was the last person to have possession of the laptop prior to it being shipped from Florida to Sterling.  (Trott 33/22-34/15)  There is evidence that the laptop was in use through September 11, 2014.  (Plaintiff's Motion for Summary Judgment, Exhibit D, Sun Report, page 6)

40.     Objection. Sun found evidence that Gibson's laptop was in use; however it would be impossible for him to discover who was actually using the laptop. Trott had access to the laptop and admitted to using it on occasion when Gibson was not in the office.  (Trott 33/3-7)

41.     No objection.  However, Trott had the ability to have surreptitiously obtained the PIN Fob.  (Gibson 149*/2-23) (Trott 18/1-19/7)

42.     Objection.  Gibson did not see anyone take her PIN Fob; however Trott had the ability to obtain the Fob when Gibson was out of the office.  (Gibson 50*/23-24, 143/9-15, 149*/2-23) (Trott 18/23-25)

43.     No objection.  However, Trott had the ability to have surreptitiously obtained the PIN Fob.  (Gibson 149*/2-23) (Trott 18/1-19/7)

44.     No objection.  However, Trott had the ability to execute the wire transfer when Gibson was out of the office.  (Gibson 50*/23-24, 143/9-15, 149*/2-23) (Trott 18/23-25, 43/8-11)

**ADDITIONAL FACTS**

45.     Deanna Trott worked at the SEI Florida office with Gibson from the middle of March 2014 until somewhere in September 2014. (Trott 12/5-7)

46.     The Florida office is rectangular in shape.  The entrance opened into a large area that served as Gibson's office area. There were two offices in the back of the space.  The office on the left was Trott's office and the office on the right doubled as a filing room and Ms. Maragh's office.  (Gibson 140/3-143/8) (Gibson Deposition Exhibit 31)

47.     Gibson's office was on the right hand side of the large main space. (Gibson Deposition Exhibit 31)

48.     Both of the offices had doors; however it was the practice that these doors remained open. (Gibson 141/5-7) (Gibson Deposition Exhibit 31)

49.     Gibson was able to see into Trott's office from her desk and observe Trott. (Gibson 141/5-7) (Gibson Deposition Exhibit 31)

50.     Gibson and Trott could not hear one another on the telephone when they were both sitting at their respective desks. (Gibson 145*/11-21) (Answer ¶ 22)

51.     Cellular service inside the office was not always reliable. (Trott 22/19-22) (Gibson 87/20-24)

52.     Trott claims that on August 22, 2014 she overheard a telephone conversation that Gibson had at her desk.  Trott recounts that Gibson received a telephone call on her office phone. (Trott 24/5-25/2)

53.     Trott claims that during this telephone call Gibson confirmed the two valid wire transfers completed on August 22, 2014.  The valid transfers originated from two different companies that Gibson was in charge of accounts for. (Trott 24/5-25/2)

54.     The first valid wire transfer on August 22, 2014 originated at 7:53:55 a.m. (Plaintiff's Motion for Summary Judgment, Exhibit D, Sun Report Exhibit C)

55.     The second valid wire transfer originated at 1:19:49 p.m. (Plaintiff's Motion for Summary Judgment, Exhibit D, Sun Report Exhibit C)

56.     Trott received email confirmations of both of these wire transfers. (Trott 24/16-18, 25/10-13, 26/19-24)

57.     Trott then states that after Gibson confirmed the valid transfers she took out her key fob and read a number over the telephone. (Trott 24/10-14)

58.     Sometime thereafter Trott claims an email notification came in showing the fraudulent wire transfer occurring at 2:37:09 p.m. (Trott 25/4-9) (Plaintiff's Motion for Summary Judgment, Exhibit D, Sun Report Exhibit C)

59.     Trott claims that on August 22, 2014 she and Gibson were unable to reach anyone at SEI because they were away on a retreat; however Bobby D., Goldberg and Gibson all deny

that there was a company retreat on that day. (Trott 21/9-10) (Bobby D. 46*/13-19) (Goldberg 21/6-15) (Gibson 88/7-22)

60.     Each key fob had a unique serial number that was associated with the authorized user. (Plaintiff's Exhibit 2, Santander Aff ¶ 7) (Goldberg 16/20-19/23)

61.     Each time the fob is used it generates a unique code that is only good for 30 seconds. (Plaintiff's Exhibit 2, Santander Aff ¶ 5) (Goldberg 16/20-18/20)

62.     Santander Bank confirmed that the fraudulent transfer originated from Gibson's fob. (Plaintiff's Exhibit 2, Santander Aff ¶ 9 Gibson 54/6-22) (Goldberg 49*/8-21, 59*/24-60/24)

63.     Quen Pham conducted a scan of Gibson's laptop shortly after the wire transfer was completed and found no viruses. (Gibson 135*/7-136/5) (Gibson Deposition Exhibit 27*)

64.     SEI's expert confirmed that no one remotely accessed Gibson's computer to release the wire transfer. (Sun Report 1, 13, 29-38) (Goldberg 51*/23-53/7)

65.     Based on Santander's internal investigation, Pham's original scan of Gibson's computer and SEI's expert's report, for the purposes of the fraudulent wire transfer that forms the basis of this litigation, providing a fob code over the phone would have had no effect on executing the transfer.

66.     Trott had a history of fabricating stories.  (Gibson 80/9-84/3) (Answer ¶ 22)

67.     The reason that Trott was terminated was because she was fabricating stories. (Gibson 80/9-84/3)

68.     The decision to terminate Trott was made jointly by Gibson and Marty McCabe in SEI's Human Resources Department.  (Trott 12/10-14, 45/25-46/6) (Gibson 79/23-84/3) (Answer ¶ 22)

Dated:  September 21, 2017

                                           Respectfully  submitted,
                                           WENDY  GIBSON
                                           By her attorney,

                                           *Isl Lauren  Thomas*
                                           Lauren  Thomas,  BB0#667973
                                           220 Commercial  Street, #9
                                           Boston, MA 02109
                                           617-997-7957
                                           lthomas@lawlt.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2017, I electronically filed the above motion and related documents by using the CM/ECF system which will send notification of such filing(s) to all registered participants.

                                           *Isl Lauren  Thomas*
                                           Lauren  Thomas